```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF ALABAMA
                      SOUTHERN DIVISION
```

DEMETRIUS ANTOINE WILLIAMS,       :

    Petitioner,                   :

v.                                :

                                      CIVIL ACTION 07-0617-WS-M

JERRY FERRELL,                    :

    Respondent.                   :


                      REPORT AND RECOMMENDATION

    This is an action under 28 U.S.C. § 2254 by an Alabama inmate which was referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), Local Rule 72.2(c)(4), and Rule 8 of the Rules Governing Section 2254 Cases.  This action is now ready for consideration.  The state record is adequate to determine Petitioner's claims; no federal evidentiary hearing is required.  It is recommended that the habeas petition be denied and that this action be dismissed.

    Petitioner was convicted of murder in the Circuit Court of Mobile County on January 13, 2005 for which he received a sentence of life in the state penitentiary (Doc. 1, p. 1). Appeal was made to the Court of Criminal Appeals of Alabama which affirmed the conviction and sentence (Doc. 11, Exhibit A).  The Alabama Supreme Court denied Williams's petition for writ of *certiorari* and entered a Certificate of Judgment on November 10, 2005, (Doc. 11, Exhibit D).

Petitioner subsequently filed a State Rule 32 petition which was dismissed, a decision which was affirmed by the Alabama Court of Criminal Appeals (Doc. 11, Exhibit C).  The Alabama Supreme Court denied Williams's petition for writ of *certiorari* and entered a Certificate of Judgment on May 11, 2007 (Doc. 11, Exhibit B).

On August 31, 2007, Petitioner filed a complaint with this Court, raising the following claims:  (1) There was insufficient evidence at trial to sustain the verdict against him; (2) his trial and appellate counsel rendered ineffective assistance in their representation of him[1] (Doc. 1).  Respondent has filed an Answer (Doc. 11) and a Supplemental Response (Doc. 16) in which he argues that Petitioner is entitled to no relief on these claims.

Respondent claims that Petitioner has procedurally defaulted on both of the claims raised in this Court.  A United States

---

[1] The Court notes that although Williams has raised claims against both his trial and appellate counsel (Doc. 1, p. 7), a close reading of the arguments reveals no actual allegations against his appellate counsel (*see* Doc. 1, pp. 13-17).
   The Court also notes that the claims raised in this petition appear to be the same claims raised in Williams's State Rule 32 petition.  Those assertions, as stated, by the Alabama Court of Criminal Appeals, are as follows:  "(a) trial counsel failed to properly investigate his case; (b) trial counsel failed to request a jury instruction pertaining to the necessary intent to commit murder; (c) trial counsel failed to establish a defense that his actions were unintentional, reckless, or negligent; (d) trial counsel allowed alleged expert testimony to be introduced through doctors pertaining to the cause and means of the infant death in a manner that misled the jury to believing that the actions of the petitioner were intentional; and (e) trial counsel allowed him to be forced to trial on a matter that warranted a plea" (Doc. 11, Exhibit C, p. 2 n.1) (quotations and citations omitted).

Supreme Court decision, *Harris v. Reed*, 489 U.S. 255 (1989), has discussed procedural default and stated that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris*, 489 U.S. at 263, *citing Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985), *quoting Michigan v. Long*, 463 U.S. 1032, 1041 (1983). The Court further notes the decisions of *Coleman v. Thompson*, 501 U.S. 722 (1991) and *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991), which held that a determination by a state appellate court affirming, without written opinion, a lower court's reasoned determination that a claimant is barred procedurally from raising certain claims in that state's courts satisfied the rule of *Harris*.

With regard to Petitioner's claim that there was insufficient evidence at trial to sustain the verdict against him, Respondent has asserted that the claim is procedurally defaulted under Ala.R.Crim.P. 32.2(a)(4)[2] (Doc. 11, p. 3). The Court notes that the Alabama Court of Criminal Appeals, on review of the dismissal of Williams's State Rule 32 petition, found that this claim was precluded (Doc. 11, Exhibit C, p. 5).

---

[2]"A petitioner will not be given relief under this rule . . . [w]hich was raised or addressed on appeal or in any previous collateral proceeding not dismissed pursuant to the last sentence of Rule 32.1 as a petition that challenges multiple judgments, whether or not the previous collateral proceeding was adjudicated on the merits of the grounds raised."

3

The Court finds that this claim is not procedurally defaulted in this Court.  The State Appellate Court did not address the claim because it had been addressed on direct appeal—not because Williams, for some procedural reason, failed to timely raise the claim and can no longer avail himself of the opportunity.  This Court will address the merit of Petitioner's claim that the evidence was insufficient to convict him.

With regard to Petitioner's claim of ineffective assistance of counsel, the Court notes that Williams raised these claims in his State Rule 32 petition and the Alabama Court of Criminal Appeals founds them to be precluded under Ala.R.Crim.P. 32.6(b)[3] and Ala.R.Crim.P. 32.3.[4]  This Court, in *Reed v. Jones*, 2000 WL 1848148, at *5-6 (S.D. Ala. 2000), has held that claims not addressed by the state courts on the basis of Ala.R.Crim.P. 32.6(b) are procedurally defaulted.  Likewise, the Eleventh Circuit Court of Appeals, in an unpublished decision, has stated that Ala.R.Crim.P. 32.3 has "been firmly established and regularly followed by the Alabama courts.  The Court of Criminal Appeals has consistently affirmed [] lower court decisions that

---

[3] "The petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds.  A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings."  Ala.R.Crim.P. 32.6(b).

[4] Ala.R.Crim.P. 32.3 states that "[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief."

have summarily dismissed Rule 32 petitions that do not include specific facts which would entitle the petitioner to collateral relief." *Jenkins v. Bullard*, 210 Fed.Appx. 895, 900, 2006 WL 3635410, *5 (11th Cir. 2006).

This Court finds that the Alabama Court of Criminal Appeals' citation of these two procedural rules satisfies the State's burden of showing that this claim is procedurally defaulted under State procedural rules.  As such, this Court finds that it is procedurally defaulted under *Harris* in this Court.

Although Respondent has claimed procedural default on both of Petitioner's claims, the Court cannot say that the requirement of *Harris* has been met as to both claims.  While the second claim is procedurally defaulted, the first is not.  Therefore, Petitioner's first claim will be adjudged according to the merits.

However, where the state courts have found claims of a petitioner to be procedurally defaulted and those courts have refused to address the merits of those claims, as is the case here, all chance of federal review is not precluded.  The Eleventh Circuit Court of Appeals, in addressing the review of these claims, has stated the following:

> Under *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) and its progeny, noncompliance with a state procedural rule generally precludes federal habeas corpus review of all claims as to which noncompliance with the procedural rule

> is an adequate ground under state law to deny
> review. If a petitioner can demonstrate both
> cause for his noncompliance and actual
> prejudice resulting therefrom, however, a
> federal court can review his claims.

*Booker v. Wainwright*, 764 F.2d 1371, 1376 (11th Cir.) (citations omitted), *cert. denied*, 474 U.S. 975 (1985). A claimant can also avoid the procedural default bar if it can be shown that a failure to consider the claims will result in a fundamental miscarriage of justice. *Engle v. Isaac*, 456 U.S. 107, 135 (1982); *see also Murray v. Carrier*, 477 U.S. 478, 496 (1986).

In this action, Petitioner has demonstrated neither cause nor prejudice for failing to raise his ineffective of assistance of counsel claim in a timely manner in the State courts, according to their rules. Furthermore, Williams has not shown that this Court's failure to discuss the merits of this claim will result in a fundamental miscarriage of justice being visited upon him. Therefore, the Court considers the second claim in this Court to be procedurally defaulted and the Court will not address its merit.

The Court will now take up the merit of Petitioner's claim that there was insufficient evidence at trial to sustain the verdict against him. It should be noted that this Court, on habeas review, does not make an independent determination of whether Petitioner is guilty or innocent. The evidence was constitutionally adequate if there was evidence presented at the

trial from which a reasonable trier of fact could find Petitioner guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979). This Court further notes that all conflicts in the evidence are resolved in favor of the prosecution. *Id*. The evidence from the trial is as follows.

The State's first witness was Keith Myrick who testified that he was a firefighter with the Mobile Fire Department on July 21, 2003 when he responded to a call, just after noon, that a child was undergoing cardiac arrest at Montlimar Apartments in Mobile County (Doc. 16, Exhibit E, Tr. 64-73). Myrick was the first one into the apartment; he was carrying a box with medical supplies and found a child on the floor beside the bed which did not seem to be breathing. Myrick moved him so that they could apply medical aid. On closer inspection, the fireman noted that the child had blood around his nostrils and a little blood on his upper lip; he was not breathing and had no pulse, so Myrick began breathing treatments with an oxygen mask and bottle while another fireman started doing chest compressions on the child. The Defendant told him the child had been down for about ten minutes. The Defendant further said that he had worked all night and gone to bed about seven in the morning with the child while the mother went to work; he woke up to a "thunk," and found the child on the floor. The Defendant said that the child had fallen off the bed a week earlier while the mother was there. Myrick said that the Defendant was not panicky or excited in his relaying information

7

to him.  The firefighter said that the application of the CPR would not cause bruising in the stomach or chest area.  The firemen were able to restore the child's heartbeat and breathing.

The next witness was Cecil Mosley, a seventh-year paramedic with Mobile Fire Rescue, who testified that he was working the rescue truck on July 21, 2003 when a call came from Montlimar Apartments (Doc. 16, Exhibit E, Tr. 73-80).  He arrived on the scene, took the child, named Ashton Nobles, and intubated him; though he had a pulse, he could not breathe on his own.  Mosley took the child to the trauma room at Springhill Memorial Hospital, continued resuscitation efforts, stabilized the child, and turned him over to the ER doctor.  The paramedic noticed two thumb-print bruises on the lower part of Noble's diaphragm which he said would have been caused by someone holding the child very tightly; he also identified a photo of the bruising which was introduced into evidence.

A traffic homicide investigator with the Mobile Police Department, named Ernest Treubig, testified that he was dispatched to the scene of this incident on July 21, 2003 (Doc. 16, Exhibit E, Tr. 81-84).  When he arrived, he observed the child being loaded into the rescue truck; Treubig identified the Defendant and said he was getting into the passenger's side of the ambulance when he arrived.  The Investigator went to the hospital and spoke with Williams who told him that he had been sleeping with Ashton when he woke up to find Ashton, crying and

hollering, wedged between the bed and a nightstand.  The Defendant stated that he removed Ashton, who took one breath and then stopped breathing.  Williams then called 911.  Treubig then talked to the physician.

The next witness was Dr. Rosa Vidal, a pediatric critical care specialist and Director of the Pediatric Intensive Care Unit at USA Women's & Children's Hospital (hereinafter *USA*), who treated Nobles after he was brought to her hospital (Doc. 16, Exhibit E, Tr. 85-108).  On arrival, he was in critical condition, having been intubated and hooked up to a mechanical ventilator; he was totally unresponsive and cold.  The doctor noted bruising on the upper right part of the abdomen at the bottom of the rib cage.  Her examination was consistent with severe brain injury.  During the next twenty-four hours, the child's heart rate and blood pressure deteriorated.  It was determined by Vidal and a Pediatric Neurologist, within twenty-four hours of the child's arrival at the hospital, that he was brain dead.  A CT scan, which had been taken at Springhill, showed subdural hematomas and retinal hemorrhages, caused by considerable force exerted on the brain.  The Doctor stated that an injury of this type would be caused by severe shaking and could not be caused by a fall from low-lying furniture.

Ashlie Charles testified that she was Ashton Noble's mother and that she was living in Montlimar Apartments on July 21, 2003 (Doc. 16, Exhibit E, Tr. 109-39).  She lived there with the

Defendant, who was her boyfriend although he was not Ashton's father, the Defendant's wife, Mary, Mary and Defendant's son, and Ashton.  Mary sometimes took care of the two children, both of whom were babies.  Ashlie testified that she got to the apartment at about one o'clock a.m. on the morning of July 21, 2003, after working her job shift, and took Ashton from Mary and tried to put him back to sleep; he played for a little while, acting normally, before falling asleep.  The next morning, Ashlie got up and began getting ready for school; Ashton was asleep.  Mary left with her baby about the time that Demetrius came in, just before Ashlie left.  Ashlie was at school when she got a call, telling her to come to Springhill Memorial.  When she got to the hospital, the Defendant told her that Ashton had fallen out of bed and he did not know what to do, so he called either Mary or his grandmother to ask them what to do; the response was to call 911.  Immediately thereafter, she saw Ashton who was being transferred to USA; she did not understand how critical his injuries were at the time.  After she left Springhill Memorial, she never saw the Defendant or Mary again.  Ashlie went to USA.  After a lengthy wait, she saw her son and noticed the bruising on his stomach; he was not moving at all.  Ashlie talked with the treating physician about Ashton's severe injuries; the doctor counseled her not to resuscitate him in the event of heart failure.  The doctors took

Ashton off life support later that evening[5] and he died.

Ashlie called Defendant the day after Ashton went to the hospital, but before he died; Williams told her that he had told his wife that they had had an affair.  When she talked with Mary, she was angry, but wished her baby well.  Ashton never talked to Mary or the Defendant again.

The next witness was Shenita Peoples who testified that she was the pharmacy director at Capps College and that she received a phone call on July 21, 2003 that Ashlie Charles's son was at the hospital and that she needed to go there to see about him (Doc. 16, Exhibit E, Tr. 146-55).

Melissa Pfhoal testified that she was the Area Director at Gentiva Health Services and that Mary Williams worked for that business as a legal alien (Doc. 16, Exhibit E, Tr. 155-74).  She testified that she was familiar with company records and presented exhibits which demonstrated that on July 21, 2003, Mary had been working with clients in their homes between the times of 8:00 - 10:00 a.m. and 10:30 a.m. - 2:30 p.m.

The next witness was Sgt. Glenn Garside who testified that he was the Supervisor in the homicide division of the Mobile Police Department and the lead investigator in this case (Doc. 16, Exhibit E, Tr. 176-214).  Garside stated that he was made aware of the incident by Officer Treubig and went to the hospital

---

[5]The testimony would seem to indicate that Ashton died after having been at USA for one full day.

with another officer and took a statement from the Defendant which he summarized as follows:

> He told us that he was at home, his apartment, Montlimar Apartments, that the child was in his care. The child's mother had gone to school and the Defendant's wife had dropped his own son off with another caregiver, family member, and she had gone to work. He said that he attempted to give the baby a bath, actually gave him a bath and gave him a little bit of milk, a little bit of water. The child was laid down. He read the Bible for a short time, then watched Jerry Springer, I believe it was. And then, after a phone call or two from his wife to check on how he was doing, he laid down and went to sleep.
> When he did that, he laid in his bed, the master bedroom or the bedroom, if you will, and laid the victim on a pillow next to him. Says he went to sleep. Once he went to sleep, he woke up a short time later hearing a noise. Looked, the child was not laying in the bed with him. He looked over on the other side of the bed to the floor and he found the child, basically, inverted. This is the head area, the face area. The child was upside down with the head cocked with the base of the head and neck was against the floor, and its back was going up along the bed rail and box spring. Picked the child up. The child was having difficulty breathing, stopped breathing. He called 911 for help and waited for the paramedics.

*Id.* at Tr. 178-79. The officers questioned the victim's mother. After obtaining a search warrant, Garside went to the apartment. The Investigator measured the distance from the floor to the top of the pillow on top of the mattress and found it to be twenty-seven inches; the floor was standard, with carpet and three-

quarters of an inch of padding.  Garside then went back to the hospital and talked to Dr. Vidal.  While he was there, he ran into the Defendant and his wife who asked to speak to him.  In the second, unrecorded, statement, Williams told him, essentially, the same thing but added that he had noticed a bruise on the child's stomach when he bathed him; in the first statement, he had said that the child had no injuries.  Williams also told him that the victim had fallen off of the couch the night before, but he seemed ok after that; Garside said that it was a distance of seventeen inches from the couch to the floor.  The Investigator talked with the Defendant a third time, the night following the death of the child.  At this point, Garside played a tape-recording of Williams's first and third[6] statements for the jury.  During the playing of the third statement, there was some testimony by Defendant that he had shaken the child and demonstrated what he had done.  Garside's testimony as to what Williams said and did was as follows:

> When he was sitting there, it was just
> if you had a child sitting on your knees
> facing you with legs towards you and the
> child actually facing you and you put your
> arms under its shoulders and armpits, two
> thumbs around its chest, your fingers around

---

[6]It is apparent from previous testimony that the second tape played is the third statement given by Williams (as Garside had testified previously that the second statement was unrecorded), though the trial transcript does not clearly reflect that the second tape played was the third (see Doc. 16, Exhibit E, Tr. 181, 184-91; cf. Tr. 300, 320-45).  There is no evidence that there were any more than three statements by Defendant.

> the back just holding it, what he
> demonstrated was taking the child and shaking
> it like this.  And then he'd put it up here
> and then he'd go back to shake and put it up
> on the shoulder and pat it on the back.

*Id.* at Tr. 191.  The Investigator introduced some photos into evidence which demonstrated bruising on Ashton's stomach and chin as well as photos of the couch and bed in relation to the floor in Williams's apartment.

The final witness for the State was Dr. Kathleen Enstice, a medical examiner with the Department of Forensic Sciences and an assistant professor of pathology at the University of South Alabama Medical Center (Doc. 16, Exhibit E, Tr. 215-41).  The doctor testified as to her qualifications and stated that she had performed 2529 autopsies, including the one on Ashton Nobles.  Enstice said that although the child was a little small for his age, he was healthy except for the injuries which killed him.  The doctor found "a series of bruises on his upper abdomen" on the right and left sides that were caused by "pressure pushing the blood from underneath the sites" (*id.* at Tr. 218-19).  Internally, the pathologist found the following:

> "a deep bruise sitting on top of the skull
> and on the inner deep portion of the scalp.
> He had two, one on the right forehead a half
> an inch in diameter, one immediately above
> the right eyebrow, which was slightly longer
> than an inch and three quarters of an inch
> thick.  He had a third contusion or deep
> subgaleal contusion right behind the left
> ear, which was an inch in length and almost

14

an inch in height.

*Id.* at Tr. 219.  Enstice said that there were three separate impacts to the head which would have caused these bruises; the doctor said that each impact would have been a "very intense, overwhelmingly intense force" (*id.* at 222).  The pathologist found swelling and blood on all surfaces of the brain caused by a violent shaking of the baby's head; blood in the top of—and surrounding the—spinal column confirmed violent movement in the neck.  Both optic nerves had blood inside of them, caused by shaking and head impacts, leaving the retinas detached.  Enstice said that these injuries could not be caused by a fall from a bed or couch.  Ashton also suffered three acutely fractured ribs on the left side as well as blood in, and surrounding, the adrenal gland.  There were three new, deep bruises on the back.  The doctor stated that the cause of death was head trauma that took place within an hour, at most, before he stopped breathing.  At the conclusion of Enstice's testimony, the State rested (*id.* at Tr. 241).

Defendant then called Officer Garside to re-take the stand (Doc. 16, Exhibit E, Tr. 242-55).  He testified that he had talked with the client, Ms. Singleton, for whom Mary Williams had been working on the day that Ashton was injured and that she had stated that she had had Mary run an errand for her to the laundromat around noon, so she was not there with her the whole

15

time between 10:30 and 2:30.  This was the Defendant's only witness.

After deliberating, the jury returned a verdict of murder (Doc. 16, Exhibit E, Tr. 276).  The Trial Judge polled the jury and each juror affirmed voting in the affirmative that Williams was guilty (*id.* at 277).  In Alabama, the crime of murder has been defined as follows:

> (a) A person commits the crime of murder if:
>   (1) With intent to cause the death of another person, he causes the death of that person or of another person; or
>   (2) Under circumstances manifesting extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person other than himself, and thereby causes the death of another person; or
>   (3) He commits or attempts to commit arson in the first degree, burglary in the first or second degree, escape in the first degree, kidnapping in the first degree, rape in the first degree, robbery in any degree, sodomy in the first degree or any other felony clearly dangerous to human life and, in the course of and in furtherance of the crime that he is committing or attempting to commit, or in immediate flight therefrom, he, or another participant if there be any, causes the death of any person.

Ala. Code § 13A-6-2(a) (1975).

The Court has reviewed the transcript and all evidence of record from the trial and finds that the evidence was constitutionally adequate under *Jackson*.  More specifically, the Court finds that the a reasonable trier of fact, if it believed

the evidence presented, could have found Petitioner guilty of murder beyond a reasonable doubt.  *Jackson*, 443 U.S. 307 (1979).

In summary, Petitioner has raised two different claims in bringing this action.  One was found to be procedurally defaulted while the other was without merit.  Therefore, it is recommended that this habeas petition be denied, that this action be dismissed, and that judgment be entered in favor of Respondent Jerry Ferrell and against Petitioner Demetrius Antoine Williams.

MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
<u>AND FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>

1.   **Objection**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed <u>de novo</u> and a different disposition made.  It is insufficient to submit only a copy of the original

17

brief submitted to the magistrate judge, although a
copy of the original brief may be submitted or referred
to and incorporated into the brief in support of the
objection.  Failure to submit a brief in support of the
objection may be deemed an abandonment of the
objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.    **Transcript (applicable where proceedings tape recorded)**. Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

DONE this 19th day of February, 2008.

                        s/BERT W. MILLING, JR.
                        UNITED STATES MAGISTRATE JUDGE